**A. C. DAVENPORT & SON CO., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 81 C 1440.**

United States District Court,
N. D. Illinois, E. D.

April 28, 1982.

Clifford E. Yuknis, Martin M. Lucente, Jr., Shefsky, Saitlin & Froelich, Richard A. Sugar, Richard A. Sugar & Associates, Chicago, Ill., for plaintiff.

Eileen M. Marutzky, Asst. U.S. Atty., Chicago, Ill., Andrea J. Salloom, General Services Administration, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Plaintiff A. C. Davenport & Son Co. ("Davenport")* brings this action for the purchase price of products delivered to the General Services Administration ("GSA"), an agency of defendant United States. The matter is before the court on the Government's motion to dismiss for lack of jurisdiction and on the parties' cross motions for summary judgment. The court denies defendant's motions to dismiss and for summary judgment and grants plaintiff's motion for summary judgment.

*Factual Background*

The parties agree that there is no genuine dispute as to any material fact and that the following facts are undisputed.

In December, 1975, the GSA contracted with Almark, Inc., of Arlington, Virginia, for the purchase of bulletin boards. In early 1976, Almark agreed with Davenport that the latter was to supply the bulletin boards that Almark was obligated to deliver under its contract with the GSA. Later that year, Davenport had reason to question Almark's ability to meet its payments under the subcontracting agreement and Davenport insisted on some arrangement to secure these payments. (See Affidavit of Duane Conwell and Plaintiff's Ex. #2.)

---

*The company was previously known as Davson or Davson.

As a result, Almark modified its contract with the GSA, changing the payment address from "Almark, Inc., 542 South 23rd Street, Arlington, Virginia 22202" to "Almark, Inc., c/o Davson, 306 East Helen[sic] Road, Palatine, IL 60067." A Government Contracting Officer approved and signed this modification. A few days later, Almark executed a corporate resolution authorizing the First National Bank to accept for deposit in a special account checks that were endorsed "Almark, Inc., c/o Davson." The resolution further authorized the Bank to pay out funds from this account only in the name of Davenport by its president, Frank A. Davenport.

Almark executed the contract modification and corporate resolution pursuant to an agreement with Davenport. The parties intended that the combined effect of the modification and resolution would be that Davenport would receive Almark's checks directly from the Government, that it could then deposit them in the special account, and that only Davenport, through its president, could withdraw the proceeds from the account.** The purpose of this arrangement was to secure Almark's payment to Davenport under the subcontracting agreement.

Between February and April, 1977, the GSA issued checks pursuant to its contract with Almark. Despite the contract modification in effect, the GSA sent these checks to Almark's Virginia address. On April 4, 1977, Davenport's Account Manager wrote the Government informing it that Davenport had not received checks for shipments made in January and February, 1977, under Almark's contract as modified. Plaintiff's Ex. #3. The second sheet of this letter bears the following handwritten note:

"Called.

(1) All payment gone to Almark by Alton Franklin

(2) Carol Dameron put stop payment on all Almark checks 4/13/77."

---

** After withdrawing the funds, Davenport was to deduct any amounts due and owing from Almark and then credit the rest to Almark's account.

The record is not clear on this point, but apparently the stop order was ineffective as to one or more of the checks sent to Almark's Virginia address for a total of $11,-822.89.

On April 28, 1977, the GSA issued what it terms a "duplicate" check for the same amount and sent this check to "Almark, Inc., c/o A. C. Davenport & Son Co." in Palatine, Illinois. Davenport endorsed and deposited this check in the special account and withdrew the funds, according to its agreement with Almark.

For some reason,[1] the Government did nothing more until November, 1977, when it wrote Davenport questioning the propriety of the latter's endorsement and deposit of the second Almark check. In July; 1978, the Government sent a formal demand to Davenport for the $11,822 and indicated that it would offset amounts due Davenport on totally unrelated contracts. Portions of this letter are significant:

> "It is [the GSA's] opinion that a duplicate payment was made to Almark, Inc. The first series of payments totalling $11,-822.89 was made to Almark, Inc. between the period February 2, 1977, and April 4, 1977. . . . The payment of $11,822.89 made to Almark, Inc., c/o A. C. Davenport and Son on April 28, 1977, by Treasury check No. 1400521, was a *duplicate payment to Almark, Inc.* of previously paid invoices." (emphasis added).

Defendant's Ex. #9. Notwithstanding its clear admission that the duplicate payment was made to Almark, the Government proceeded to withhold payments due Davenport on the unrelated contracts, as setoffs of the amount the Government claimed Davenport owed it under the Almark contract. Davenport brought this action to recover some $5,000 owed on one of the unrelated contracts.

### Jurisdictional Amount

■ The Government argues that it has offset sums totalling more than $10,000. As a result, it contends that the amount in controversy between it and Davenport exceeds the jurisdictional limit provided by 28 U.S.C. § 1346(a), and that the case properly belongs in the Court of Claims.[2] Davenport contends that separate and distinct contracts constitute separate and distinct causes of action, *United States v. Louisville & Nashville Railroad Co.*, 221 F.2d 698, 702 (6th Cir. 1955), and that it may sue on one contract involving less than $10,000 even though the aggregate of all the sums involved in all the contracts exceeds $10,000. See *Fitzgerald v. Staats*, 429 F.Supp. 933, 935 (D.D.C.), *aff'd*, 578 F.2d 435 (D.C.Cir. 1977), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 616, 58 L.Ed.2d 680 (1978), where the court stated that the fact that a party has two or more claims for $10,000 or less, but aggregating more than $10,000, does not deprive the district court of jurisdiction.

The court agrees with Davenport's position and denies defendant's motion to dismiss.

### Assignment of Claims Act

■ In their briefs, the parties concentrate on arguing whether or not the agreement between Davenport and Almark, which resulted in the contract modification and corporate resolution giving Davenport the exclusive right to withdraw funds deposited in the special account, amounted to an assignment in violation of the Assignment of Claims Act, 31 U.S.C. § 203, and if so, whether or not the Government waived compliance with the Act.[3] Frankly, the

---

1. Davenport's Account Manager averred on information and belief that Almark went bankrupt in late 1977. Affidavit of Duane Conwell.

2. Section 1346(a) reads in relevant part:
 The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
 > \* \* \* \* \* \*
 (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States.

3. The Act states, in pertinent part:
 All transfers and assignments made of any claim upon the United States . . . shall be absolutely null and void, unless [certain conditions are met].
 It is undisputed that the statutory conditions were not fulfilled in this case. Moreover, the circumstances here are readily distinguishable

court considers that these issues are nothing more than "red herrings." Either the agreement between Davenport and Almark was not an assignment or, if an assignment was attempted, it failed. In either case, it is clear that there is no valid assignment here. This conclusion, however, does not aid the court in resolving the crucial issue in this case, which is, can the Government compel Davenport to refund a duplicate payment that it made to Almark?

The Government seems to assume that the lack of a valid assignment between Almark and Davenport necessitates a decision in its favor. Even without a valid assignment, however, the Government must establish some legal basis for claiming the $11,822 that Almark turned over to Davenport. The Government cannot claim a contractual basis, as there was no privity of contract between the GSA and Davenport with regard to the $11,822; the contract ran between the GSA and Almark.

Because there was neither a contractual relationship nor an assignment, Davenport could not have sued the Government had it refused to pay the $11,822, nor could Davenport have sued the Government had it sent only one check and that to Almark in Virginia. See *United States v. Smith*, 393 F.2d 318 (5th Cir. 1968). In *Smith*, a wife was awarded one-half of her serviceman husband's pay as property settlement in a divorce action. The husband then wrote an "irrevocable" letter directing his pay be deposited in an escrow for division, which letter, however, he later revoked. The court held that the wife had no claim against the United States for her share of the pay, in part because the "irrevocable" letter was not a valid assignment.

The Government analogizes Davenport's position to that of the wife in *Smith*. From this, the Government argues that it is entitled to compel Davenport to refund the amount of the second check. Because Davenport could not force the GSA to pay it,

the Government reasons, it has no right to the proceeds of the second check, and therefore the Government can compel Davenport to refund it by imposing setoffs.

The flaw in the Government's reasoning is its conclusion that, because Davenport could not compel the GSA to issue the check in the first instance, it had no right to the proceeds of the check. This ignores the indisputable fact that Davenport's right to the check did not originate from the Government, but from Almark. Davenport, in essence, received the check from Almark. The Government has admitted as much, as it has consistently taken the position that the contract modification was no more than a change in the payee's address and not a change in the payee.

Even though Almark did not assign its contact with the GSA to Davenport, this would not automatically render the agreement between Almark and Davenport null and void. In *Segal v. Rochelle*, 382 U.S. 375, 384, 86 S.Ct. 511, 517, 15 L.Ed.2d 428 (1966), the Supreme Court stated that despite the broad language of the Assignment of Claims Act, it " 'must be interpreted in the light of its purpose to give protection to the Government' so that between the parties effect might still be given to an assignment that failed to comply with the statute," quoting *Martin v. National Surety Co.*, 300 U.S. 588, 596, 57 S.Ct. 531, 534, 81 L.Ed. 822 (1937). See also *Kolb v. Berlin*, 356 F.2d 269, 270 (5th Cir. 1966); 3A Moore, *Federal Practice*, ¶ 17.09 [1.–2] at 17–101. The Government, in fact, has not disputed here that Davenport was in fact entitled to payment from Almark.

This being the case, that the Government gave Almark two checks and that Almark gave one of those checks to Davenport while keeping the other, the Government must establish some basis for following the payment made to Almark into Davenport's hands. This the Government has completely failed to do, and the court's own re-

from those in cases where courts have found a waiver of the Act's requirements, *cf. Tuftco*

*Corp. v. United States*, 614 F.2d 740 (Ct.Cl. 1980).

search [4] indicates that the Government cannot do so in the circumstances of this case.

## Government's Right to Recovery

 The Government clearly has the right, existing at common law independent of any statute, to recover a duplicate payment made by mistake. "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414, 415, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). And this right is a federal right, *United States v. A&C Investments, Inc.*, 513 F.Supp. 589 (N.D.Ill.1981). It is equally evident that the Government could seek to recover the duplicate payment from Almark, either on the basis of privity of contract or under a theory of unjust enrichment. But the Government's right to proceed against Davenport is more problematic, there being no privity of contract between them nor unjust enrichment on Davenport's part.

When the Government sent the first check or checks to Almark in Virginia, it discharged its obligation under the contract and Davenport could not legally have compelled the Government to issue another check.[5] *See United States v. Smith, supra*, pg. 733. When the Government sent the second check to Almark c/o Davenport, it was presumably operating under a mistake of fact, believing that payment on the first check or checks had been stopped. *Cf. In re Sabre Shipping Corp.*, 299 F.Supp. 97, 101 (S.D.N.Y.1969) (duplicate payment a mistake of fact).

Under general legal principles, the Government could not recover the mistaken duplicate payment from Davenport.

"Where A, under a mistaken belief in his liability to B, on direction of the latter pays C a claim which C has against B, A cannot recover the payment from C. If the payment was voluntarily and intentionally paid by A to C to satisfy the latter's claim against B, and C had a genuine claim against B, it seems clear no recovery should be allowed. C is a purchaser of the money for value and in good faith."

13 Williston, *Contracts* § 1574 at 495.[6] Here, the Government, mistakenly believing it had stopped payment on the first check or checks, sent a second check to Davenport pursuant to Almark's direction, to satisfy Davenport's genuine claim against Almark and to insure Davenport's continued performance of its subcontracting agreement with Almark. In these circumstances, the Government should not be able to pass on to Davenport the consequences of its own mistake.

The equities in this case overwhelmingly favor Davenport. It strikes the court that there is something inherently inequitable in imposing the loss in this case on the only party who has performed without fault. The problem of the double payment arose due to the Government's own error and the only reason, as far as the court can determine, that it is now seeking recovery from Davenport rather than Almark is because Almark is bankrupt. Yet, Davenport is not answerable for either the Government's mistake or Almark's insolvency.

The court does not need to rely on general legal principles, however. The court concludes that under Illinois law Davenport took the second check as a holder in due course and thus took it free of any defenses,

---

4. In passing, the court notes that the parties have been singularly unhelpful on the issue of the Government's right to compel repayment from Davenport, despite the court's requesting supplemental briefs on this issue.

5. Davenport did threaten to stop further deliveries under the Almark contract, and this it could have done as it had not received payment from Almark, either directly or by Government check, for its prior deliveries. If Davenport had discontinued delivery, the Government would have had no recourse against Davenport,

but only against Almark. Undoubtedly it was because of this fact and in order to insure continued delivery that the Government consented to stop payment on the checks sent directly to Almark and to issue a duplicate check to Almark c/o Davenport.

6. *Cf.* 3 Corbin, *Contracts* § 617 at 756–57:
 "Restitution for mistake of law may properly be refused because ... the interests of some innocent third party must be protected."

such as duplicate payment, that the payor (the Government) may have had against the payee (Almark).[7] Because Davenport was entitled to the proceeds of the check, the Government may not offset the amount of the check against its outstanding debts to Davenport.

*Holder in Due Course*

■ The court begins its analysis by examining the significance of the contract modification. It was not an assignment, so Almark remained the payee under the Almark-GSA contract even after the modification took effect. By means of the modification, Almark transferred or delivered its check to Davenport.

If this were all, if Davenport merely took possession of the check as a transferee, the Government would be entitled to recover the proceeds of the check from Davenport. As a transferee, Davenport would only take such rights to the check as its transferor, Almark, had, Ill.Rev.Stat. ch. 26, ¶ 3–201(1), and Almark had no rights to the second check because it had received and cashed the first check or checks. If, however, the second check was negotiated by Almark to Davenport, then Davenport would be a holder and entitled to the rights of a holder.

Looking to the pertinent Illinois statute, Ill.Rev.Stat. ch. 26, ¶ 3–201(3), provides:

> Unless otherwise agreed any transfer for value of an instrument not then payable to bearer gives the transferee the specifically enforceable right to have the unqualified indorsement of the transferor. Negotiation takes effect only when the indorsement is made. . . .

There is no dispute that the transfer of the second check to Davenport was for value, as Davenport was supplying the bulletin boards that Almark had contracted to deliver to the GSA. Davenport was thus entitled to Almark's endorsement. Pursuant to the corporate resolution and the agreement between Almark and Davenport, the necessary endorsement was supplied by affixing "Almark, Inc., c/o A. C. Davenport & Son" on the back of the check,[8] and Davenport[9] was empowered to so endorse the check.[9] The check was endorsed; at that point it was negotiated and Davenport became a holder.

■ A holder becomes a holder in due course if he takes the instrument for value, in good faith and without notice of any defense or claim against it on the part of any person. *Ritz v. Karstenson*, 39 Ill. App.3d 877, 350 N.E.2d 870 (2d Dist. 1976); Ill.Rev.Stat. ch. 26, ¶ 3–302(1). Again, there can be no dispute that Davenport took the second check for value and in good faith, but the court must consider carefully whether it took the check without notice of any defense on the part of the Government.

A person has notice of a fact when he has actual knowledge of it or when from all the facts and circumstances known to him at the time he has reason to know of it. Ill. Rev.Stat. ch. 26, ¶ 1–201(25). There is nothing in the record to indicate that at the time Davenport received the second check which was dated April 28, 1977, it had actual knowledge that the Government had paid the first check or checks, thereby discharging its obligation under the Almark contract.

Prior to receiving the second check, however, Davenport did know that the GSA had sent checks directly to Almark, but it also knew that the GSA had put a stop payment order on the checks. The question is whether, knowing this, Davenport had reason to know that the April 28th check was an erroneous duplicate payment. The court concludes that Davenport did not have rea-

---

7. Although the parties did not brief the issue, the court determines that Illinois law applies as there are substantial contacts between Illinois and the dispute at issue and it is the law of the forum.

8. Ill.Rev.Stat. ch. 26, ¶ 3–401(2) provides that a signature may be made by any name, word or mark in lieu of a written signature. Committee Note 2 further specifies that a signature may be typed, printed, or made in any other manner. The endorsement here was typed or stamped on the back of the check.

9. Ill.Rev.Stat. ch. 26, ¶ 3–403(1) provides that a signature may be made by an agent or other representative.

son to know that the check it received was a mistake, because there is nothing in the record to indicate that Davenport knew or suspected that the stop order had not been effective.

The burden is upon the Government to establish that, at the time it took the check, Davenport knew or should have known that it was a double payment. In *Bank of North Carolina v. Rock Island Bank*, 630 F.2d 1243 (7th Cir. 1980), the Court examined Illinois law, Ill.Rev.Stat. ch. 26, ¶ 3–307, to determine the allocation of the burden of proof on the holder in due course issue. The court held:

> "Section 3–307 provides that if the holder of a negotiable instrument produces the instrument and the signatures are not in dispute, the holder may recover under the instrument unless a defense is established. It is only after a defense is shown to exist that the holder bears the burden of proving that it is a holder in due course."

*Id.* at 1246. Because the defendant failed to establish a valid defense to the negotiable instrument in that case, the Court directed the district court to enter judgment in the plaintiff's favor. *Accord Ritz v. Karstenson*, 39 Ill.App.3d 877, 883, 350 N.E.2d 870, 874 (2d Dist. 1976).

Similarly, here the Government has not shown that at the time Davenport took the check it knew or should have known that the stop order had been ineffective and that the Government had already paid the $11,-822. As the Government had the burden of proof on that issue, Davenport need not establish affirmatively that it had no notice. The Government's failure to come forward with some proof of a valid defense mandates a finding that Davenport was a holder in due course.

Being a holder in due course, Davenport took the check free from all defenses of any party to the check with whom it had not dealt, Ill.Rev.Stat. ch. 26, ¶ 3–305. Davenport did not "deal" with the Government with regards to the check because it did not take the check as a payee or an assignee of the payee or as a result of any other imme-diate transaction with the Government; it took the check by negotiation from Almark. *Cf. Chicago Title & Trust Co. v. Walsh*, 34 Ill.App.3d 458, 468–69, 340 N.E.2d 106, 113–14 (1st Dist. 1975).

In *Chicago Title*, the court reasoned that in order for the payees to have dealt with the drawer-bank within the meaning of the statute, the payees must have participated in the exchange of forged cashier's checks for the bank drafts in dispute; that the payees had dealt with the bank as escrowee was insufficient. The court concluded that the statute was not meant to reach everyone who was a party to the underlying transaction. Here, Davenport's cooperating with the GSA as a subcontractor to Almark does not constitute "dealing" within the purview of ¶ 3–305.

Because Davenport took the check free and clear of the defense of double payment, the Government cannot claim that Davenport had no right to the check or its proceeds. As Davenport had a right to the check, the Government cannot offset the amount of the check against the amount it owes Davenport on unrelated contracts. Moreover, the Government has conceded that it has no other defenses to the payment of the purchase prices due Davenport at issue in this case, and thus Davenport is entitled to the amounts due and owing.

Accordingly, Davenport's motion for summary judgment is granted, the Government's motions to dismiss and for summary judgment are denied, and the case is dismissed.